BRIAN MICHAELS, OSB 925607
Chair of Eugene Springfield NAACP
 Legal Redress Committee
259 East Fifth Avenue, Suite 300D
Eugene, Oregon 97401
(541) 687-0578
Fax (541) 686-2137
brian@brianmichaelslaw.com

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| ASHLEY LEANN CARR, | CASE NO.:  6:21-cv-1402 |
| Plaintiff, | COMPLAINT |
| v. | 42 U.S.C. 1983 – VIOLATION OF: FIRST AMENDMENT RIGHT TO ASSOCIATE AND REDRESS OF GRIEVANCES; FOURTH AMENDMENT RIGHT TO BE FREE OF UNLAWFUL DETENTION; FOURTEENTH AMENDMENT GUARANTEE OF EQUAL PROTECTION UNDER THE LAW; PLAINTIFFS IDENTIFY A PROTECTED LIBERTY INTEREST ARISING FROM PLAINTIFFS′ RIGHT TO PRIVACY AND RIGHT TO BE LEFT ALONE, and PUNITIVE DAMAGES JURY TRIAL REQUESTED |
| CITY OF SPRINGFIELD; OFFICER JOSEPH BURKE (BADGE 365), | |
| Defendants. | |

Southern trees bear a strange fruit
Blood on the leaves and blood at the root
Black bodies swingin' in the Southern breeze
Strange fruit hangin' from the poplar trees

Billie Holiday's "Strange Fruit.[1]"

---

[1] Subject of the recent film, "USA v Billie Holiday," depicting the persecution and ultimate arrest of Billie Holiday for continuing to sing this song.

## I.      INTRODUCTION

1.      Eugene's own City Councilor Greg Evans, after testifying at the Oregon Senate and the Oregon House[2] in hearings to pass legislation banning nooses as signs of terror and intimidation, has now written this passage for this Complaint:

> In the United States of America, the noose is a symbol of terrorism, not unlike the swastika. It is the very visualization of a murder method preferred by those intent on intimidating and destroying African Americans. From Jim Crow post-Civil War to present day, like the swastika, we all know what it means.
>
> My uncle, Walter Graham, was just seventeen years old when he was brutally murdered by lynching. It was December of 1915 during the post-Civil War terrorist anti-Black movement in the former Confederacy. Walter lived in the small town of Blacksburg, South Carolina, located on the border of both Carolinas. Everyone knew everyone in the small community of Blacksburg, white people and Black people alike. On a seemingly ordinary day, Walter and his siblings went to town to get supplies for their vocation of farming. He had an interaction with a local white man that left the man stewing and angry after the family returned to their farm.
>
> The white man, apparently angered by something Walter said, immediately organized a lynching party comprised of his friends, family, and other white community members. More than 50 armed people proceeded to the meager shack housing where the family lived. The lynch mob descended on Walter. Neighbors and other family members fled the scene, watching it unfold from the woods meanwhile fearing that they'd be next. After throwing the pre-tied rope over a thick branch of a nearby tree, they put the noose around young Walter's neck. Slowly lifting and lowering him, they simultaneously caused horrific agonizing pain and suffering and stole his very last breath. As if that were not enough, the mob insulted his body and our family even further by opening fire on his lifeless body shredding skin, flesh, and bone. Thirst unquenched, the mob burned his body and then burned the



---

[2] A Register-Guard article on topic can be found online at https://www.registerguard.com/story/news/2021/03/04/oregon-moves-ban-display-nooses-racist-symbol/4580238001/

Graham family shack homes. For days after, rumors circulated in the community that the mob would reconvene for further entertainment at the expense of my family.

My family left South Carolina shortly after Walter's murder and went north to Ohio. They never returned and lost contact with those of whom chose to stay. My family was part of the first wave of the Great Migration during World War 1; Black Americans migrated north for economic opportunities and for freedom from the terror ever present in the south.

2.     This photograph is of the noose hanging a skeleton across the street from plaintiff's home.

Plaintiff is Black.



3.     Approximately June 20, 2020 NASCAR found a noose hanging in the garage of its only

Black driver, Bubba Wallace.

4.    In a conference call with reporters, NASCAR president Steve Phelps said it conducted a



thorough sweep of all 1,684 garage stalls at the 29 tracks the league uses, and "They found only

11 total ropes that had a pulldown rope tied in a knot," he said, "and just one noose: The one in

Bubba Wallace's garage." Here is a picture of that noose.


## II.    JURISDICTION AND VENUE

5.    This is a civil action for damages and attorney's fees, violation of Fourth Amendment right

to be free from unlawful detention; violation of First Amendment right to associate and redress of

grievances, and violation of Fourteenth Amendment right to equal protection under the law, for

Plaintiff Ashley LeAnn Carr, arising from police detaining Plaintiff Ashley Carr in front of her

home, questioning whether she really lived there, why she was there and whether she and her

friend were a part of that "mob" – Black Unity or Black Lives Matter – then describing the noose

across from her home as a Halloween decoration, while speaking on the phone with the man who

hung the noose, and terrifying her and putting her safety in her home in question. A full transcription and timeline are included in this complaint, *infra*.

6.      Jurisdiction for the federal claims exists under 28 U.S.C. 1331 because this action arises under the laws of the United States.

7.      Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C. 1391(b) in that this is a civil action wherein jurisdiction is not founded on diversity of citizenship and plaintiff's claims arise within this judicial district.

## III.    PARTIES

### A.    Plaintiff Ashley Carr

8.      At all relevant times, Plaintiff was a resident of Lane County, Oregon.

9.      Plaintiff Ashley LeAnn Carr is a member of the organization Black Unity, and resided at 6993 Bluebelle Way in Springfield, Oregon.  On July 28, 2020, she was with her friend Kinaya Haug, a fellow member of Black Unity, sitting in Ms. Haug's vehicle outside Ms. Carr's home, when defendant Officer Burke chose to walk up to them, and detained them to ask them why they were looking at the house with the noose. Officer Burke accused Ms. Carr and her friend of not belonging in that neighborhood and of being with "that mob" (Black Lives Matter, aka BLM,and/or Black Unity).

### B.    Defendant Joseph Burke, Springfield Police Department (Badge #365)

10.     Defendant Officer Joseph Burke is sued in his individual official capacity. He was, at all times relevant, an officer of the Springfield Police Department. As explained in detail herein, Officer Burke arrived at the location in Springfield where a home was displaying a noose across the street from where the plaintiff lived.

11.     Defendant City of Springfield is a municipal corporation charged with and responsible for

hiring, training, supervising, and promoting the members of the SPD and its personnel. At all relevant times the City had the power, right, and duty to control the manner in which the individual defendants carried out the objectives of their employment, and to see that all orders, rules, training, instructions, and regulations promulgated for the SPD were consistent with the State and federal constitutions, statutes, and the laws of the municipality.

**C.    David Harbick**

12.    Mr. Harbick is Plaintiff's neighbor, residing on Bluebelle Way, Springfield, OR 97478, across the street from plaintiff. Mr. Harbick rents the home at that address. Mr. Harbick's home is two houses northwest of the house directly across from Ms. Carr's home.

### IV.    FACTUAL OVERVIEW

**Ashley Carr**

13.    The foregoing paragraphs are incorporated herein by reference.

14.    Ashley LeAnn Carr is a single mother of three children, and shares custody of the children with their father, from whom she is divorced. Ms. Carr is employed at the Center for Family Development as a community mental health counselor and has been since May 2019. As a direct consequence of the traumatic incident described herein, she has had to cut her hours from full-time to 0.6 time; as well as increasing her need for psychiatric care. Ms. Carr and her children rented the house on Bluebelle Way from February 2020 to July 31, 2020. Two of Ms. Carr's children attended Thurston Elementary School near their home on Bluebelle Way.

15.    There is a video of the entire interaction described herein.  A transcript is provided below. The interaction with Defendant Officer Burke involved him stopping a vehicle Plaintiff Ashley Carr was a passenger in. They were parked outside of Ms. Carr's home and she was accused of being where she does not belong, of being a part of that "mob," Black Unity, and of harassing the man across the street for having a noose hanging outside his home (see above photograph), which

Defendant Burke called a "Halloween decoration." On the video, Defendant Burke is heard calling the man on his cell phone, calling him by his first name, to discuss the situation.

16.    Both organizations, Black Unity and BLM, were created to amplify the voice of Black Americans through peaceful protests and promoting efforts to reallocate police functions away from militarized tactics and weaponry, while redirecting them toward the use of de-escalation tactics, to eliminate the unnecessary and precipitous use of force exhibited in the murders of George Floyd, Michael Brown, Eric Garner, Daniel Prude, and so many others.

### Timeline of Local Events

17.    Against the backdrop of national and local unrest related to incidents of Black American citizens being murdered by police officers and other citizens, Black citizens organized peaceful marches and protests in the City of Springfield during 2020.

18.    Black Lives Matter was "founded in 2013 in response to the acquittal of Trayvon Martin's murderer."[3]

19.    Black Unity was formed in June 2020 as a group distinct from the Black Lives Matter Eugene group.

20.    Ms. Carr participated in two Black Unity-hosted protests, rallies, and marches in support of Black Lives Matter and Black Unity groups.

21.    One of the biggest protests ever held in Lane County, Oregon, occurred on May 31, 2020, following the murder of George Floyd.

22.    By early June 2020, two Gadsden Flags had been raised in neighborhoods near Ms. Carr's home. More Gadsden flags followed. In recent years, the Gadsden flag, with its famous snake and slogan "Don't Tread on Me," has been adopted by white supremacist groups. Black Americans

---

[3] *Black Lives Matter,* retrieved June 4, 2021 from https://blacklivesmatter.com/herstory/

see it as a symbol of racism.[4]

23.    Ms. Carr's neighbors frequently used racial slurs and made terrifying statements of intentions to take their guns and "take back [their] land" (paraphrased). Ms. Carr's concern was quickly replaced by fear, and on June 16, 2020, she called her landlady asking for support and guidance. The landlady stated that she would look into mediation and seek guidance from knowledgeable community members, but never followed up with Ms. Carr, despite repeated requests for communication. For context, Ms. Carr would like to share that her landlady is a white woman.

24.    Ms. Carr attended a Juneteenth celebration held in Eugene June 19, 2020.

25.    The first protest held in the Thurston neighborhood took place June 27, 2020.

26.    On June 28, 2020, Black Unity held a "children's march" meant to include children in the movement. A Black Unity leader was hit by a white man driving his car towards the march. Just the next day, Ms. Carr heard neighbors state that it was "hilarious" and "'funny" that a Black man was hit by a car, and that he "had it coming."

27.    A couple weeks later, on July 14, 2020, the leadership team of an organization Ms. Carr directs (Willamette Racism Response Network or "WRRN") met with Ms. Carr in her driveway. The group chose to meet outside for social distancing purposes.

28.    David Harbick lives on Bluebelle Way, Springfield, OR 97478, across the street and two houses up the street from plaintiff. As discussed *infra*, on or about July 23, 2020, he hung the noose with the skeleton that is portrayed in paragraph 2, above. During the July 14 meeting, Mr. Harbick sat in his yard and watched/listened to the entirety of the two and a half hour working meetingof the WRRN. Also during the meeting, a Springfield police officer rolled by slowly and checked

---

[4] The New Yorker, *"The Shifting Symbolism of the Gadsden Flag,"* October 2, 2016, retrieved June 4, 2021, from https://www.newyorker.com/news/news-desk/the-shifting-symbolism-of-the-gadsden-flag.

them out without stopping. There was only one white person in attendance, with six people who were brown or Black.

29.    On July 23, 2020, a friend and member of the leadership team of WRRN drove past Ms. Carr's house and noticed the noose hanging in the tree in the front yard of her neighbor's home. She sent Ms. Carr a picture and asked Ms. Carr if she had ever seen it, to which she responded she had not.

30.    Ms. Carr was shocked. The neighbor's house had always made Ms. Carr uncomfortable, due to their year-round Halloween decorations, but the noose was new. Ms. Carr's perception was that the noose was racially motivated and meant to scare her.

31.    The next day, Ms. Carr made a post on her personal Facebook page stating that if she was found dead and it appeared self-inflicted, that it was not her doing and that she was not planning to take her own life. In the comments on that post, she shared that her neighbors had hung a noose in their tree. A Black Unity leader noticed the comment and direct-messaged Ms. Carr, asking if they could share her story. Ms. Carr agreed.

32.    On July 26, 2020, that Black Unity leader posted screenshots of Ms. Carr's Facebook posts detailing the racial tension and discrimination, as well as their impacts on her life, in the Black Unity group. Many people commented, and outrage grew.

33.    Following the appearance of the noose, Ms. Carr sought help from others to keep herself and her children safe. She got help arranging for people to sit outside of her home while her children were home.

34.    On July 27, 2020, Springfield police officers were dispatched to Ms. Carr's home due to a call about a "suspicious person" sitting in front of her home. The person was sitting in his automobile at the request of Ms. Carr. The person was masked for Covid and legally openly carrying a gun. The two officers came in separate cars, immediately apprehended him and drew

their guns on him. They took his phone and searched it, learning private details about Ms. Carr's personal circumstances.

35.     Ms. Carr was frightened and wanted the officers to leave. The person who was watching over her home and family decided it was too risky to be there and left. No one else who initially offered to help felt safe enough to come after that. Ms. Carr was on her own.

36.     On July 28, 2020, Ms. Carr met a friend for lunch. During their lunch the two women discussed how the friend could be helpful and supportive for Ms. Carr as Ms. Carr made plans to keep herself and her children safe while she explored the costs and opportunities to move from that neighborhood. During lunch, the two friends saw that a protest in Ms. Carr's neighborhood had been announced in support of Ms. Carr, titled "The Noose is a Nuisance," which was scheduled for the next day. Upon returning from lunch, the two women noticed a police officer in an unmarked car pull up in front of the house with the noose.

37.     The officer then approached Ms. Carr and her friend, who were sitting in her friend's automobile, preparing to go into Ms. Carr's house. The officer was Joe Burke, badge number 365, of Springfield Police Department. Officer Burke stated, "My dispatcher tells me that -- that you guys are -- or have prior associations with the whole mob movement that's been going on in Eugene." He accused Ms. Carr's friend of harassing the neighbor with the noose, and of being in the neighborhood uninvited. The interaction between Ms. Carr, her friend, and Officer Burke was recorded by cell phones.

38.     During the interaction with Officer Burke, Ms. Carr and her friend sent messages requesting support and witnesses. Several Black Unity leaders, friends, co-leaders from Ms. Carr's organization, and people from the Eugene Wall of Moms group arrived. This group stayed with Ms. Carr and supported her.

39.     Ms. Carr stayed at a hotel the nights of July 30 and July 31, 2020, then for a more lengthy

stay until accommodations could be made. Ms. Carr felt so terrorized by Burke, the noose, and the whole buddy-buddy thing between Burke and the neighbor, that after Burke left she made sure she was surrounded by mostly Black Unity members. Some of these people standing in front of her house guarding with guns, all along the street.

40.     As one supporter was leaving, she stated to another neighbor, "You could just be nice to her." The neighbor threw his chair and lunged at her but was held back by others.

41.     The "Noose is a Nuisance" protest was held on July 29, 2020, in the Thurston area of Springfield. Ms. Carr did not attend but instead remained in her home with the lights off and curtains closed, and monitored the front of her house through her Ring doorbell. Ms. Carr was afraid.

42.     Ms. Carr left her home on Bluebelle Way the afternoon of July 30, 2020, afraid for her safety, her children's safety, indeed, afraid for her life. As of the date of this complaint, Ms. Carr has not returned. Friends, acquaintances, and strangers alike helped her move, took care of her animals, and supported her desire to remain anonymous.

43.     Ms. Carr is under psychiatric care. Her physician documented in her medical file a profound downturn in her psychiatric health resulting from this incident.  Her supervisor where she works noticed the same. At this point, she is not sure she and her children will ever be safe.


### Officer Burke's intimidation and violation of the right to privacy and liberty interests of Ms. Carr and Kinaya Haug

44.     Officer Burke was parked on Ms. Carr's street July 28, 2020, when Ms. Carr, along with Kinaya Haug, returned to Ms. Carr's residence following lunch, where they learned a protest was being organized in support of Ms. Carr. The protest was being called "The Noose is a Nuisance," scheduled for July 29, 2020.

45.     Officer Burke approached the vehicle in which Ms. Carr and Kinaya Haug were sitting in front of Ms. Carr's home. Officer Burke had seen Ms. Haug's car before and accused them of several types of unseemly behavior, including belonging to a mob and harassment. (See transcript below) In fact, Officer Burke accused Ms. Carr many, many times that she did not live there. Officer Burke used his cell phone to call the neighbor with the noose, calling him by his first name, after interrogating and arguing with Ms. Carr and her friend. As indicated in the transcript, the conversation was friendly and familiar. Burke was solicitous and openly supportive of the noose, playing it down as nothing but a decoration from Halloween. The neighbor with the noose is "David" in the audio transcription of the cell phone video image of the encounter. In contrast, Officer Burke's tone and demeanor toward the two Black women was accusatory, authoritative, as well as dismissive of their concerns about the noose.

46.     A transcript of the interaction Officer Burke had with Ms. Carr and Ms. Haug was transcribed by C&C Reporters, Ely Knapp. It is formatted by C&C to fit the format of a Complaint, rather than in the format of atypical transcription paging:

July 28, 2020

OFFICER BURKE: I'm wondering why you're here. My dispatcher tells me that -- that you guys are -- or have prior associations with thewhole mob movement that's been going on in --

        KINAYA: Mob movement? Are you-- can we record this?

        ASHLEY:  Yeah, can we record this?

        OFFICER BURKE:  I'm recording.  Feel free.

        KINAYA:  Okay.  Well, I want to recordit too.

        OFFICER BURKE:  Feel free.

KINAYA: So you're saying that I have prior engagement with the mob movement?

OFFICER BURKE: I'm saying that my dispatchers tell me that there's associations with this vehicle and people involved with this vehicle --

KINAYA: With this vehicle? My vehicle?

OFFICER BURKE: Are you willing to listen or you just want to talk over me?

KINAYA: Oh, okay.

OFFICER BURKE: Yeah, this vehicle.

ASHLEY: Wait, wait, wait. Sorry. Really quick --

OFFICER BURKE: So I notice that you're here. You don't live here. My dispatcher says that you live in Eugene.

KINAYA: She lives here.

ASHLEY: I live here. We're spending time together.

KINAYA: We went to lunch.

OFFICER BURKE: Okay. And you seem to have a particular interest in this house.

KINAYA: There's a noose hanging in front of that house.

OFFICER BURKE: Uh-huh.

KINAYA: I'm wondering why there's a noose hanging in front of that house.

OFFICER BURKE: I've heard that social media has some intention of probably canceling this guy and destroying his -- destroying his livelihood because --

KINAYA: Destroying it?

OFFICER BURKE: -- that's what you guys do.

KINAYA: We destroy livelihoods?

ASHLEY: That's what we --

OFFICER BURKE (on the phone): This is Officer Burke. Go ahead. Okay.

ASHLEY: Oh, no. This is not real.

OFFICER BURKE (on the phone): Okay.

ASHLEY:  This is not real. This is not real.

KINAYA:  Hold on.

ASHLEY: You're going live? This is not real. Oh, my God.

KINAYA: So I went to lunch with my friend, and she lives over in Thurston. We just got back.  There's a cop in front of the house over there that has -- over there -- that has a noose --

OFFICER BURKE: Do you live on this street, ma'am?

KINAYA: She lives on the street.

OFFICER BURKE: On this street?

KINAYA:  Yes.

So he says that I'm, and my car, are associated with a mob --

OFFICER BURKE (on the phone):  David, are you there?

KINAYA: -- that happens in Eugene --and so they're wondering why we're over here.

OFFICER BURKE (on the phone):  Hey, I'm Officer Burke. I work (unintelligible) probably being recorded. Well, there is a car outside your house right now that's associated with the BLM movement, Black Unity Movement, what have you, that I'm guessing is part of the group that's --

KINAYA:  He says I'm part of a mob.

OFFICER BURKE (on the phone): I'm guessing they're part of the group that's attaching stuff all over social media saying that they're going to meet at Jesse Maine and they're probably going to protest your Halloween decorations or something like that. It's all pretty ridiculous, but I'm here outside your house. If you have a moment, can you return?

ASHLEY: Excuse me. I'm not planning on talking to him -- or you.

OFFICER BURKE (on the phone): I -- sir, I don't care about your Halloween decorations, like I care about Christmas lights on a house.

KINAYA: Because it doesn't affect you.


OFFICER BURKE (on the phone): But these people do.

KINAYA: These people?

OFFICER BURKE (on the phone): They

care deeply about it, so much so that they plan on protesting your house.

ASHLEY: You're talking to two Black people right now.

KINAYA: Do you know that Black people --

OFFICER BURKE (on the phone): They're part of the group, part of the BLM. I'm not kidding you, sir. I'm not kidding.

ASHLEY: You have two Black people sitting in front of you.

KINAYA: I need you to call my mother.

ASHLEY: What's your phone number?

OFFICER BURKE (on the phone): If you think I want to be outside your house taking to you about Halloween decorations, I don't.

KINAYA: You guys are on 70th? What is your address?

ASHLEY: 6993 Bluebelle Way.

KINAYA: 699- --

ASHLEY: -- -3 Bluebelle Way.

KINAYA: -- -3 Bluebelle Way.

ASHLEY: Get here now.

OFFICER BURKE (on the phone): But the BLM, Black Unity group, they're hellbent on (unintelligible) --

KINAYA: And I need you to get here, anybody.

OFFICER BURKE (on the phone): --

that's hanging around that skeleton's neck.

KINAYA: Anybody listening please needs to come to 6993 Bluebelle Way.

OFFICER BURKE (on the phone): Yeah.

I -- I believe you that it's been -- I believe you that it's been hanging there for four years. They don't care.

KINAYA: You guys, please come.

OFFICER BURKE (on the phone): -- cancelling you.

KINAYA: Tell the group right now. Tell the group right now.

OFFICER BURKE (on the phone): You're not in trouble or anything like that, but before they have a chance to --

KINAYA: I literally did nothing but look at the skeleton. Of course I'm going to lookat a skeleton hanging up after everything that's going on. And he's telling me that I'm doing something wrong.

OFFICER BURKE (on the phone): Sir, they're -- they're hellbent on --

KINAYA: I haven't done anything.

OFFICER BURKE (on the phone):  I'm not telling --

KINAYA:  I literally just went to lunch with my friend -- literally just went to lunch with my friend. We just went to lunch together.

OFFICER BURKE (on the phone):  I'm not -- David. David. David. They're going to make you look like a racist even though these Halloween decorations have been up for four years.


KINAYA:  Did he just hang up the noose? Did you just -- he just recently hung up thenoose. Right?

OFFICER BURKE:  It's been four years that it's been hanging up.

KINAYA:  The noose has been hung up for four years? Specifically that?

OFFICER BURKE:  That's what he tells me.  You choose not to believe it because you want to -- you want to create the narrative you'd like tocreate.  But the reality is his decorations have been up for four years.  That's what he's telling me.

ASHLEY:  Are you allowed to say something like that as a police officer?


OFFICER BURKE:  Well, you just asserted -- you just --

OFFICER BURKE (on the phone):  Sorry, David.  I'm having an alternate conversation with two of these people.

KINAYA:  These people.

OFFICER BURKE:  You asserted – you asserted that he just hung up that stuff. I'm telling you that's not the case. He's telling me it's not the case.

ASHLEY:  Who's "you"?


OFFICER BURKE:  But you would like to create a false narrative for your own propaganda efforts. That's it.

(Conclusion of excerpt.)

47.    Approximately one week prior to this confrontation, Ashley Carr held a picnic/meeting in her front yard due to COVID. This was a WRRN meeting to organize a time and manner for a project to help youth in reading.  Two of the attendees recall specifically noticing there was no noose across the street.  They recall this because there were several people looking at them, intimidating them, even to the point of having a police car drive by slowly. One the most prominent of these people was Mr. Harbick, drawing attention to him and his house. They saw no noose.

48.    Ms. Carr and Kinaya Haug were afraid as they witnessed the white officer speak to their white neighbor by first name and justify that the noose was an appropriate decoration because the white neighbor claimed it had been there for four years.  The white officer continued to refer to BLM and Black Unity as a mob, "hell bent" on causing trouble for the white neighbor, including making the neighbor look racist.

49.    Mr. Harbick removed the noose following the conversation with Officer Burke.

**The Children**

50.    Before the noose was hung, Ms. Carr's older two children would regularly ride their scooters up and down the street (Bluebelle), to the park and around the block, to their friends' home.

51.    After the noose was hung, and Ms. Carr had the encounter with defendant Officer Burke, the children felt intimidated by the police presence and by the neighbor's noose on their street, causing them to change the path they took to and from their home and friends' home. They became fearful of police, with a growing sense of nervousness about their safety.  They stayed with their father for a month. The separation between Ms. Carr and her children was the hardest thing she has ever had to endure.

52.    The children felt intimidated by police frequently driving by then slowing down in front of their home after this incident with Defendant Burke.

53.     The 8-year-old, then 7, told her mother she was afraid her mother would be shot like MLK Jr.. The oldest daughter has diagnoses of anxiety, ADHD, and selective mutism that can be verified through medical records. She takes medication for ADHD and anxiety. The middle child has ADHD, for which she takes medication. The youngest has severe asthma, and though not mental health, it is a documented diagnosis. All of this can be verified through their medical records.

54.     Because of the police harassment, Ms. Carr feared imminent arrest or injury and so she made the decision that her children would not spend shared custody time with her for over a month but would instead stay with their father. During that time, following the events described above, the father assumed full custody of the children and they did not visit Ms. Carr at her home.

55.     These fears and decisions relating to her children caused Ms. Carr to move from the home on Bluebelle Way, causing financial burden by breaking her lease and losing her deposit.

56.     Ms. Carr moved to another home which was outside of the children's old school boundaries. As a result, the children were forced to change schools, change their friends, and separate from their pets - chickens, dog and cat. They also lost their school psychologist, a Black woman who held special lunch groups with kids of color, and also helped the oldest work on her selective mutism.


**FIRST CLAIM FOR RELIEF**
**(Violation of Constitutional Right to;**
**Freedom of Speech, Freedom to Associate, Freedom to Petition the**
**Government for Redress of Grievances, and Right to Privacy)**
**(42 U.S.C. § 1983, First Amendment to the U.S. Constitution)**
**(Defendant Burke)**


57.     The foregoing paragraphs are incorporated herein by reference.

58.     Defendant Burke intimidated plaintiff Ashley Carr because of her race, and her affiliation with Black Unity and Black Lives Matter, along with those groups' assembly to petition the

government for redress of grievances; and he did so without just cause, or other constitutionally adequate lawful provision. By his actions described herein, acting under color of law, statute, ordinance, regulation, custom, or usage, defendant Burke subjected plaintiff to deprivation of her, of her rights to associate, speak freely, and petition the government for redress of grievances, which constitutes rights, privileges, or immunities secured by the Constitution and laws.

59.     As a direct and proximate result of defendant singling out plaintiff for her race, her speech, her right to petition the government for redress of grievances, and associations, plaintiff sustained noneconomic damages, including loss of liberty; mental and emotional suffering; humiliation; shame; embarrassment; worry; fear; anguish; shock; nervousness; and anxiety; all to her damage in an amount to be ascertained according to proof at trial. Plaintiff also suffered severe emotional trauma as well as mental anguish from experiencing the adverse effects on her children.

60.     As a direct and proximate result of the unlawful detention, plaintiff sustained economic damages, including hotel costs stemming from having to leave her home and other expenses from being unable to live in her home, along with collateral expenses that go along with not being able to live at home.

61.     Plaintiff was forced to hire attorneys for her representation. She is entitled to reasonable attorney fees pursuant to 42 U.S.C. 1988.

62.     The actions of the defendant Burke, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon plaintiff. As a result of said intentional conduct, plaintiff is entitled to punitive damages against defendant Burke in an amount sufficient to punish him and to deter others from like conduct.

63.     Plaintiff is entitled to a jury trial.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS
## FOURTH AMENDMENT TO THE U.S. CONSTITUTION
## UNLAWFUL DETENTION, IMPRISONMENT,
## VIOLATION OF LIBERTY INTERESTS
## VIOLATION OF RIGHT TO PRIVACY - SEIZURE
## (42 U.S.C. § 1983)
## (Defendant Burke)

64.     The foregoing paragraphs are incorporated herein by reference.

65.     By defendant Burke's actions as described herein, plaintiff Ashley Carr was detained without a warrant, probable cause, or other constitutionally adequate lawful provision, and defendant Burke, acting under color of statute, ordinance, regulation, custom, or usage, subjected plaintiff to the deprivation of her liberty interests, which constitutes rights, privileges, or immunities secured by the Constitution and laws.

66.     As a direct and proximate result of the unlawful detention and arrest, plaintiff sustained noneconomic damages, including loss of liberty; mental and emotional suffering; humiliation; shame; embarrassment; worry; fear; anguish; shock; nervousness; and anxiety; all to her damage in an amount to be ascertained according to proof at trial. Plaintiff also suffered severe emotional trauma as well as mental anguish from experiencing the effects on her children.

67.     As a direct and proximate result of the unlawful detention, plaintiff sustained economic damages, including hotel costs stemming from having to leave her home and other expenses that go along with not being able to live at home.

68.     Plaintiff was forced to hire attorneys for her representation, and is entitled to attorney fees under 42 U.S.C. 1988.

69.     The actions of defendant Burke, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon plaintiff. As a result of said intentional conduct, plaintiff is entitled to

punitive damages against defendant Burke in an amount sufficient to punish him and to deter others from like conduct.

70.     Plaintiff is entitled to a jury trial.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE FOURTEENTH AMENDMENT'S**
**GUARANTEES OF EQUAL PROTECTION**
**VIOLATION OF LIBERTY INTERESTS**
**AND VIOLATION OF RIGHT TO PRIVACY**
**(42 U.S.C. § 1983)**
**(Defendant Burke**)

71.     The foregoing paragraphs are incorporated herein by reference.

72.     By their actions as described herein, defendant Burke, under color of statute, ordinance, regulation, custom, or usage, subjected plaintiff to the deprivation of rights, privileges, or immunities secured by the Fourteenth Amendment of United States Constitution and laws; namely, plaintiff was singled out for intimidation and harassment based upon her race, and the political associations she joined as referenced in the First Claim For Relief.

73.     As a direct and proximate result of the unlawful detention and arrest, plaintiff sustained noneconomic damages, including loss of liberty; mental and emotional suffering; humiliation; shame; embarrassment; worry; fear; anguish; shock; nervousness; and anxiety; all to her damage in an amount to be ascertained according to proof at trial. Plaintiff also suffered severe emotional trauma as well as mental anguish from experiencing the effects on her children.

74.

As a direct result of defendants' actions, plaintiffs suffered economic damages, in an amount to be determined at trial, including hotel costs stemming from having to leave her home, and other expenses that go along with not being able to live at home.

Plaintiff was forced to hire attorneys for her representation, and is entitled to attorney fees under 42 U.S.C. 1988.

75.    The actions of defendant Burke, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon plaintiff. As a result of said intentional conduct, plaintiff is entitled to punitive damages against defendant Burke in an amount sufficient to punish him and to deter others from like conduct.

76.    Plaintiff is entitled to a jury trial.

**FOURTH CLAIM FOR RELIEF**
**(Municipal Liability Claim - 42 U.S.C. § 1983;**
**Monell v. Dept. of Social Services and Adickes v. Kress)**
**(Racial Bias)**
**(Defendant City of Springfield)**

77.    The foregoing paragraphs are incorporated herein by reference.

78.    Defendant City has failed to properly train its officers in how to treat Black people and those involved in Black causes and assemblies in a racially mixed situation. Race must never be a factor when deciding whom to approach, stop, intimidate, or insult one's political views. In this case race and racial politics were the sole factors in defendant Burke making the decisions he made regarding plaintiff.

79.    Defendant City is directly liable to plaintiff for its unconstitutional policies, customs, or practices; and/or for failing to properly train its officers.

80.    As a direct and proximate result of the actions and omissions described in this complaint, plaintiff incurred the damages alleged herein, and plaintiff was required to hire attorneys to represent her in this matter and is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

81.    Plaintiff seeks a jury trial for this and all claims.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests a jury trial and demands judgment in her favor and against defendants of $250,000 for the relief sought herein; for her reasonable costs and attorney fees; and for any other relief deemed appropriate by the court.

Respectfully submitted this 22nd day of September 2021,

BY:                                     s/ BRIAN MICHAELS
                                        BRIAN MICHAELS, OSB # 925607
                                        259 E. 5th Ave., Ste 300D
                                        Eugene, Oregon 97401
                                        541.687.0578
                                                    Attorney for Plaintiff