IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ASHLEY LEANN CARR,                                   Case No. 6:21-cv-01402-MC

                Plaintiff,                      ORDER & OPINION

      v.

CITY OF SPRINGFIELD and
OFFICER JOSEPH BURKE (BADGE 365),

                Defendants.

_____

MCSHANE, District Judge:

Plaintiff Ashley LeAnn Car filed this action on September 22, 2021, alleging that Springfield Police Officer Joseph Burke, and the City of Springfield by extension, violated her constitutional rights during an interaction in front of her home. Pl.'s Compl., ECF No. 1.

Defendant Burke and the City each moved for summary judgment on all claims. Burke's Mot. Summ. J., ECF No. 46; City's Mot. Summ. J., ECF No. 45. After the pleadings, responses, and exhibits, the Court found no genuine dispute of fact and granted summary judgment in Defendants' favor, with this Opinion to follow. Order, ECF No. 64.

For the reasons stated below, Defendants are entitled to judgment as a matter of law on all claims.

## **BACKGROUND**

The following facts are undisputed. They begin on July 23, 2020, when Plaintiff's friend texted her a picture of a noose hanging from a neighbor's tree.

At the time, Plaintiff was living on Bluebelle Way across the street and two houses up from David Harbick, Plaintiff's neighbor.[1] Compl. ¶ 12. Mr. Harbick's "house had always made [Plaintiff] uncomfortable, due to [its] year-round Halloween decorations." *Id.* at ¶ 30. Spiders and skeletons had garnished the front of Mr. Harbick's home for around four years prior to Plaintiff living on Bluebelle Way. City's Mot. Ex. 1, at 17; Pl.'s Resp. Ex. 5, at 33, ECF No. 56.[2]

When Plaintiff's friend texted her an image of the noose, however, Plaintiff responded that she had never seen it before. Compl. ¶ 30. Her "perception was that the noose was racially motivated and meant to scare her" as a Black woman. *Id.*

The day after receiving the text, Plaintiff posted her concerns about the noose on her Facebook feed. City's Mot. Ex. 1, at 40. The post was shared throughout Plaintiff's Facebook community and eventually precipitated the organization of a protest entitled "The Noose is a Nuisance." Compl. ¶¶ 32–36. Springfield Police caught wind of the protest and dispatched Defendant Burke to "personally contact" Mr. Harbick "and discuss the possible removal of his decorations." Pl.'s Resp. Ex. 5, at 33; *see also* at 6, 22.

Defendant Burke arrived on Bluebelle Way the day before the protest was scheduled to occur. Plaintiff happened to be sitting outside of her home in a car with her friend, Kinaya Haug. Montoya Decl. Ex. 1, at 4–6, ECF No. 47. When Defendant Burke arrived, he parked on the opposite side of the street and approached Mr. Harbick's front door. *Id.* Receiving no answer, he turned and walked toward Plaintiff and Ms. Haug who were "watching, curious." *Id.* at 5; *see also* Pl.'s Resp. Ex. 5, at 33.

---

[1] Mr. Harbick is not, and has never been, a party to this action.

[2] Page numbers correspond with PDF pagination.

By all accounts, the interaction between Defendant Burke, Plaintiff, and Ms. Haug was not ideal. According to Plaintiff, Defendant Burke "accused [Ms. Haug] of harassing the neighbor with the noose, and of being in the neighborhood uninvited." Compl. ⁋ 37. Plaintiff alleges Defendant Burke accused Plaintiff of not living at the residence, as well as "several types of unseemly behavior" including "mob" involvement. *Id.* at 45. At some point, Defendant Burke managed to contact Mr. Harbick on the phone. In his report, Defendant Burke noted that Mr. Harbick explained "the decorations have been up for 4 years" because "Halloween is his favorite holiday." Pl.'s Resp. Ex. 5, at 33. Plaintiff felt that Defendant Burke's conversation with Mr. Harbick was "friendly and familiar" in a way that downplayed Plaintiff's concerns regarding the noose. Compl. ⁋ 45.

Mr. Harbick eventually returned home and approached Plaintiff and Defendant Burke, at which point Defendant told the parties to stay away from each other. Pl.'s Resp. Ex. 5, at 33; Montoya Decl. Ex. 1, at 6. Following his conversation with Defendant Burke, Mr. Harbick removed the noose. Compl. ⁋ 49. The protest was held the next day. *Id.* at ⁋ 41.

Based on the above events, Plaintiff filed her Complaint, asserting four constitutional deprivation claims against Defendant Burke and the City. Defendants moved for summary judgment on all claims.

## **STANDARD OF REVIEW**

Summary judgment is proper "if the movant [has] show[n] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine" dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e). A dispute

is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In ruling on a motion for summary judgment, the court must not weigh the evidence or the credibility of the testimony to determine the truth of the matter. *Id.* Rather, the court must view the evidence in the light most favorable to and make all reasonable inferences in favor of the non-movant, to determine if a genuine dispute is present. *Id.*

## DISCUSSION

### I.    Claims against Defendant Burke

Against Defendant Burke, Plaintiff asserts three claims pursuant to 42 U.S.C. § 1983 for violations of her First, Fourth, and Fourteenth Amendment rights. To prevail on a § 1983 claim, Plaintiff must show that Defendant Burke, acting under color of law, deprived her of a constitutional right. *E.g.*, *Thomas v. Carpenter*, 881 F.2d 828, 829 (9th Cir. 1989). It is clear Defendant Burke was acting under color of law, but Plaintiff has failed to show that any resulting constitutional deprivations occurred.

#### A.    First Claim for Relief: First Amendment Violation

Plaintiff's first claim is labeled as a First Amendment violation, invoking Plaintiff's right to "Freedom of Speech, Freedom to Associate, Freedom to Petition the Government for Redress of Grievances, and Right to Privacy." Compl. ¶¶ 57–63.

Defendant Burke moved against this claim, noting that it is not a model of clarity. And in her Response, Plaintiff attempted to clarify the claim's basis, stating:

> It is not the free speech of Burke, but his behavior, accusations, and intent to attack two African American citizens for *their* exercise of the **right of the people peaceably to assemble, and to petition the Government for a redress of grievances**, by accusing them of belonging to a mob, riotous protests and the like. Plaintiff is not claiming retaliation, but rather the chilling effect of

> police behavior toward their participation in upcoming protests by
> Black Unity and Black Lives Matter.

Pl.'s Resp. 6 (emphasis in the original). Absent in Plaintiff's clarification is an applicable legal standard. Rather, Plaintiff copy and pastes the legal standard Defendant provides in his Motion regarding freedom of expressive association claims, and then pivots to an analogy about "licensing of association." *Id.* at 8–9.

It is not the Court's duty to make Plaintiff's arguments for her. Plaintiff's brief fails to demonstrate any genuine dispute of material fact as to this claim, let alone clarity regarding what is being alleged. Affording her every inference, however, the Court has reviewed the record and found no evidence of a First Amendment violation.

"The First Amendment forbids government officials from retaliating against individuals for speaking out." *E.g.*, *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). Implicit in the rights "protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (cleaned up). Action by law enforcement that is "designed to retaliate against and chill political expression strikes at the heart of the First Amendment." *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986). However, "plaintiffs may not recover merely on the basis of a speculative 'chill' due to generalized and legitimate law enforcement initiatives." *Id.*

Plaintiff here asserts that Defendant Burke's language was "saturated with racist attitudes" and "designed to intimidate" her and Ms. Haug from participating in the protests. To support this, Plaintiff points to the fact that Defendant Burke used terms like "riot" and "mob," and that he ran Mr. Haug's plates prior to speaking with the women. The undisputed record reflects, however, that Defendant Burke was not there to stop the women from attending the

protest; he was there to discuss with Mr. Harbick the removal of the noose in order to appease

the protest. That task was accomplished, and the protest was still held. As to his word choice,

while lacking consideration for the current social climate, it does not reflect a design to retaliate

and chill Plaintiff's political expression. When asked to further explain the interaction and what

about it "terrorized" her, Plaintiff offered the following:

> The way he spoke and the things that he said about accusing us of
> being a part of a mob movement and saying that her car was
> known to be -- I can't remember the exact thing he said – but
> basically saying that her car is well-known in the area. And saying
> to us, "I think all lives matter." And his overall demeanor when he
> said that, he looked very angry and scary. That's one part. And
> then the way he spoke with David, it was very clear that he
> believed David, that they are Halloween decorations that have been
> up. And he said to us -- he equated them with, like, a lawn chair or
> Christmas decorations. And so in -- and also he asked me – if you
> go through the video and count, it's a lot of times he asked me if I
> lived there and then accused me of being there to harass David.
> And I don't think even by the last time he asked me if I lived there
> that he actually believed me that I lived there. So all of that put
> together was scary because, you know, I didn't know what was
> going to happen. He clearly had some specific beliefs about things
> that he knew went against, you know, what I stand for, and he was
> also insinuating that I was there to harass David, and so, you know,
> it just – it really scared me.

Montoya Decl. Ex. 1, at 8–9.

The Court understands that Defendant Burke should have taken a more understanding

approach to the Plaintiff's fear of a racist symbol. He may well need training or discipline as a

result of his attitude toward Plaintiff. If his response to the situation was truly "all lives matter,"

Defendant Burke has no understanding of what the Black Lives Matter movement is attempting

to address. It comes across as ignorant and offensive. But it cannot be said that in responding to a

complaint and successfully removing the problem, Defendant Burke was taking adverse action

against Plaintiff's constitutionally protected freedom of expression. Correspondingly,

Defendant's point is well taken that the First Amendment goes both ways. Public officials are not prohibited from responding to the speech of citizens with speech of their own. *See Mulligan v. Nichols*, 835 F.3d 983, 989 (9th Cir. 2016).

It appears that Plaintiff's allegations boil down to a poor interaction. That does not, in and of itself, raise to First Amendment violation. Defendant Burke did not detain her, did not threaten her, and did not arrest her, by Plaintiff's own account. *See infra* Part B. Because there is no dispute that Defendant Burke chilled Plaintiff's freedom of expression, Defendant is entitled to judgment as a matter of law on Plaintiff's First Claim for Relief.

## B.  Second Claim for Relief: Fourth Amendment Violation

Plaintiff's second claim alleges that Defendant Burke, "by his actions," subjected Plaintiff to "unlawful detention and arrest" in contravention of her Fourth Amendment rights. Compl. ¶¶ 65–67.

The Fourth Amendment protects citizens from unreasonable seizure by the government. U.S. Const. amend. IV. It is designed to prevent police from arbitrarily and oppressively interfering with a citizen's privacy and personal security, but it does not outright proscribe all contact between police and citizens. *E.g.*, *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984). Only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed she was not free to leave, does the encounter become a "seizure" or detention within the meaning of the Fourth Amendment. *Id.*

Here, Plaintiff's deposition clarifies that she was not detained by Defendant Burke. When asked about the incident, Plaintiff testified under oath that Defendant Burke did not arrest her. Montoya Decl. Ex. 1, at 9. When asked if Defendant Burke told her she could not leave, Plaintiff responded "No." *Id.* Defendant Burke likewise never commanded Plaintiff to keep her hands

where he could see them, never told Plaintiff to get out of the car, and never attempted to stop

Plaintiff from leaving. *Id.* at 8, 9, 10. He also did not threaten her or threaten to arrest her,

according to Plaintiff. *Id.* at 9, 10. "The only thing" Plaintiff recalls Defendant saying is "stay

over there" when he was going to talk to Mr. Harbick. *Id.* at 10.

    Based on Plaintiff's own testimony, it is apparent that Defendant Burke did not conduct

himself in a manner that would cause a reasonable person in Plaintiff's circumstance to believe

she could not leave. Because there is no dispute that Plaintiff was neither detained nor arrested

within the meaning of the Fourth Amendment, Defendant is entitled to judgment as a matter of

law on Plaintiff's Second Claim for Relief.

### C.  Third Claim for Relief: Fourteenth Amendment Violation

In her third claim, Plaintiff asserts that she was "singled out for intimidation and

harassment based upon her race, and the political associations she joined" in violation of the

Fourteenth Amendment's Equal Protection Clause. Compl. ⁋⁋ 72–75.

"The Equal Protection Clause requires the State to treat all similarly situated people

equally." *E.g.*, *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013). To prevail on an Equal

Protection Clause violation, "[p]roof of racially discriminatory intent is required." *E.g.*, *City of

Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 195 (2003). Courts "will

not impute discriminatory motives to the [defendant] without any supporting evidence." *Hisp.

Taco Vendors of Wash. v. City of Pasco*, 994 F.2d 676, 680 (9th Cir. 1993).

Plaintiff here supports her Equal Protection claim with six excerpts from Defendant

Burke's deposition. They include that Defendant Burke: (1) referred to Mr. Harbick's lawn

ornaments as "Halloween decorations," (2) did not believe Plaintiff's stated address, (3) stated he

was there to prevent riotous behavior at the upcoming protest, (4) testified that protests

commonly devolved into riots following the killing of George Floyd, (5) "stated a variety of reasons…to satisfy the question presented in the context he wanted to cause the questioner to believe," and (5) reported that Plaintiff and Mr. Haug swore and yelled. Pl.'s Resp. 9–10.

Again, Defendant Burke certainly could have been more understanding of Plaintiff's concerns, yet none of these excerpts demonstrate racially discriminatory intent or that Plaintiff was treated differently from someone else similarly situated. Defendant Burke is entitled to judgment as a matter of law on Plaintiff's Third Claim for Relief.

## II.    <u>Claim against the City</u>

Plaintiff asserts her Fourth Claim for Relief against the City, seeking to establish municipal liability under a *Monell* theory. Plaintiff alleges that the "City has failed to properly train its officers in how to treat Black people and those involved in Black causes and assemblies in a racially mixed situation." Compl. ⁋ 78.

*Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658 (1978) established that a municipality can be held liable under 42 U.S.C. § 1983 for injuries sustained because of a municipal custom or policy. To prevail on a *Monell* claim, a plaintiff must show (1) a constitutional deprivation (2) caused by (3) a municipal policy, practice, or custom (4) that amounts to deliberate indifference of one's constitutional rights. *E.g.*, *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

Plaintiff's *Monell* claim fails for three independent reasons.

First, no constitutional deprivation has occurred. "While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights." *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994). Plaintiff here has alleged violations of her First, Fourth, and Fourteenth Amendment rights. However, the Court, as provided above,

finds each claim to be without any evidentiary support. Without some constitutional deprivation, the City cannot be found liable.

Second, Plaintiff has failed to present evidence indicating that the City has a policy or custom of failing to train its officers on how to treat people of color.[3] For *Monell* purposes, a municipal policy or custom does not have to "receive[] formal approval through a [municipality's] official decision-making channels." *Monell*, 436 U.S. at 691. However, a municipality cannot be held liable solely for the actions of its employees or agents. *Id.* at 694. Here, Plaintiff has not provided any evidence of a policy reflecting deliberate indifference to race. When asked if she had "any specific information on how [SPD] trains its officers with respect to dealing with individuals of color," Plaintiff responded that she is aware "some training" occurs. City's Mot. Ex. 1, at 41–42. When asked if she knew "anything specific about [SPD] and how they dealt with peoples of color," Plaintiff answered with generalities and acknowledged that her impressions were based "not personal experience" but rather "stories of interactions from friends." *Id.* at 32–34, 51, 52. When asked if SPD was "a department of systemic racism," Plaintiff responded: "I can't say that anyone has ever specifically said those words to me." *Id.* at 44. She later clarified that she does "believe that systemic racism occurs in [SPD]," but that her belief was based on one experience with Defendant Burke. *Id.* at 44–45. Absent a formal policy, Plaintiff must show a "longstanding practice or custom" of the City. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (holding that *Monell* liability cannot be predicated on isolated or sporadic incidents). Plaintiff fails in that pursuit as well, as her claims

---

[3] Failure to train may amount to a policy of "deliberate indifference," if the need to train was obvious and the failure to do so made a violation of constitutional rights likely. *City of Canton v. Harris,* 489 U.S. 378, 390 (1989). Similarly, a failure to supervise that is "sufficiently inadequate" may amount to "deliberate indifference." *Davis v. City of Ellensburg,* 869 F.2d 1230, 1235 (9th Cir.1989). Mere negligence in training or supervision, however, does not give rise to a *Monell* claim. *Id.*

rest fatally on one sole interaction with Defendant Burke. During her deposition, she acknowledged that she did not know Defendant Burke or "anything about Burke prior to 2020." City's Mot. Ex. 1, at 48. Naturally, she was unable to provide another example of a negative interaction. *Id.* A single incident is too isolated to support *Monell* liability.[4]

Lastly, Plaintiff cannot demonstrate the requisite causal link. In her Complaint, Plaintiff alleges that "race and racial politics were the sole factors in defendant Burke making the decisions he made regarding plaintiff." Compl. ¶ 78. Without providing a policy or custom to which Defendant Burke's actions can be causally linked, his conduct is his own. And as a result, this claim becomes nothing more than improperly packaged attempt at *respondeat superior*. *See Monell*, 436 U.S. at 694 ("a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents…it is when execution of a government's policy or custom…inflicts the injury that the government as an entity is responsible").

Without evidence of a custom or policy and how that custom or policy violated a constitutional right, the conclusory statements offered in the Complaint are inadequate to prevent summary judgment. *See Boyd v. Benton Cnty.*, 374 F.3d 773, 784 (9th Cir. 2004). The City is entitled to judgment as a matter of law on Plaintiff's Fourth Claim for Relief.

## CONCLUSION

For the reasons stated above, Plaintiff's claims cannot survive summary judgment. In granting summary judgment for Defendants, the Court does not deny Plaintiff's sentiments that she earnestly feared for her safety when confronted with the symbol of the noose in her

---

[4] Plaintiff attempts to bolster this claim by providing declarations from former SPD Detective Scott McKee and community organizer Johanis Tadeo. *See* Pl.'s Resp. Exs. 1, 2, 3, ECF No. 53. Plaintiff presents these Declarations "to establish a material fact concerning Defendant city's animus toward racially motivated complaints by the city of Springfield, spurring a police culture of racially animus behavior." Pl.'s Resp. 6. Neither of these individuals are parties to this action, and neither Declaration constitutes admissible evidence to support a finding of an unconstitutional policy or practice by the City.

neighbor's yard. The fact that Defendant Burke and Mr. Harbick believed it to be an innocent Halloween decoration does not mean Plaintiff's fear was contrived. Defendant Burke should have been sensitive to this as a person charged with understanding and ameliorating these kind of disputes.

Defendants are entitled to judgment as a matter of law on each claim brought by Plaintiff. The Motions for Summary Judgment, ECF Nos. 45 and 46, are therefore GRANTED.

IT IS SO ORDERED.

DATED this  15th  day of ____October____, 2024.

                                    _____/s/Michael J. McShane_____
                                            Michael McShane
                                        United State District Judge